# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

ACCENTURE LLP,                                      )
                                                    )
      Plaintiff,                             )
                                                    )
      v.                                     )   Case No. 1:17-cv-1013
                                                    )
MARC A. BOUDRIA; ROSS A. MCINTYRE;                  )   Judge:
MATTHEW L. MURRAY; and JOHN J. TODOR,               )
                                                    )
      Defendants.                            )
                                                    )

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Accenture LLP ("Accenture"), for its Verified Complaint for Injunctive Relief and Damages against Defendants Marc A. Boudria ("Boudria"), Ross A. McIntyre ("McIntyre"), Matthew L. Murray ("Murray"), and John J. Todor ("Todor") (collectively, the "Defendants"), alleges as follows:

### NATURE OF THE CASE

1.     This is an action for immediate and permanent relief from a wrongful, well-orchestrated, and clandestine campaign by a group of former Accenture employees to steal Accenture's trade secrets relating to its digital consulting and innovation unit (including source code), to raid Accenture's employees, and to engage in solicitation of Accenture clients, all in an effort to form a competitive start-up digital consulting firm, HyperGiant, LLC ("HyperGiant").

2.     In 2015, Accenture spent tens of millions of dollars to acquire the Defendants' then-employer, a creative technology studio, Chaotic Moon, LLC ("Chaotic Moon"). In connection with that acquisition, Accenture retained as full-time employees Chaotic Moon's CEO and founder, Benjamin Lamm ("Lamm"), its Chief Revenue Officer, John Fremont

("Fremont"), and a number of the studio's employees, including Will Womble ("Womble") and Defendants Boudria, McIntyre, Murray, and Todor.

3.     In just over two years, Lamm, Womble, and Fremont were gone from Accenture. They then induced, encouraged, and conspired with Defendants, who were then still Accenture employees, to form a business competitive with Accenture—HyperGiant—and, in anticipation of such formation, to leverage their status as trusted Accenture employees to solicit other Accenture employees and to misappropriate copious amounts of Accenture confidential, proprietary, and trade secret information.

4.     In furtherance of Defendants' deliberate scheme, and in coordination with Lamm Fremont, and Womble, Defendants plotted and executed their defection from Accenture willfully and maliciously.  In the months prior to their abrupt resignations from Accenture and immediate hire by HyperGiant, Defendants, in breach of their statutory, contractual, and fiduciary duties to Accenture, assisted in laying the groundwork for HyperGiant's formation, solicited other Accenture employees to defect, and, without authorization, copied, removed, and absconded with Accenture's confidential, proprietary, and trade secret information.

5.     Accenture's investigation is ongoing, but it has revealed, among other things, Defendants' direct theft of Accenture's trade secrets, including artificial intelligence source code. The investigation has also revealed that Defendants engaged in extensive communications in furtherance of their scheme among themselves and their co-conspirators.  Defendants attempted to hide those communications by conducting them on what they thought were secret communication sites inaccessible to Accenture and by using secret code names for each other. Defendants then took deliberate steps to destroy all evidence of those communications. Accenture, however, was able to find some (but not all) of the communications through its

forensic recovery of data.  The evidence obtained to date reveals a covert and concerted effort involving Defendants, Lamm, Womble, and others, acting in concert with one another, to begin what they called a "stealth" startup technology company, HyperGiant, to compete directly with Accenture, to solicit its employees, to solicit its clients, and to steal its trade secrets, all in conscious disregard of the contractual, common law, and statutory duties owed to Accenture. Accenture's investigation is ongoing.

6.      As a result of the wrongful acts described above, Accenture has suffered, and will continue to suffer, irreparable harm.  The immediate purpose of this lawsuit is to secure temporary and permanent injunctive relief to: (i) prevent further misappropriation of Accenture's confidential, proprietary, and trade secret information; and (ii) to prevent further violations of Defendants' contractual, statutory, and common law obligations.  Accenture also seeks to obtain substantial monetary damages and other relief for the ongoing harm Defendants' unlawful actions have caused and will continue to cause to Accenture.

## THE PARTIES

7.      Plaintiff Accenture LLP is a limited liability partnership organized and existing under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.

8.      Defendant Marc A. Boudria is a citizen of Texas who resides at 300 E. Riverside Drive, Apt. 314, Austin, Texas 78704.  At Accenture, Boudria was employed as a Research and Development Lead and served as a member of the Marketing Team and Go-to-Market Team. Boudria is a current employee of HyperGiant.

9.      Defendant Ross A. McIntyre is a citizen of Texas who resides at 8901 Cima Circle, Austin, Texas 78737.  While employed by Accenture, McIntyre was a Business Development Lead, and served as a member on the Go-to-Market Team, focused on product

strategy.  McIntyre is currently working as the Vice President of Strategy of HyperGiant.

10.    Defendant Matthew L. Murray is a citizen of Texas who resides at 7606 Kiva Drive, Austin, Texas 78749.  Murray was formerly employed by Accenture as a Research and Development Lead and member of the Marketing Team.   Murray is currently working as HyperGiant's Director of Research and Development and Lead Creative Technologist.

11.    Defendant John J. Todor[1] is a citizen of Texas who resides at 4305 Twisted Tree Drive, Austin, Texas, 78735.   While employed by Accenture, Todor was a Senior Sales Manager.  Todor is currently working at HyperGiant.

## RELEVANT NON-PARTIES

12.    HyperGiant, LLC, a Delaware limited liability company with a principal place of business in Texas, is an artificial intelligence consultancy competing with Accenture in the digital consulting and innovation space.

13.    Benjamin E. Lamm is a former Accenture Managing Director, who served as a Digital Practice and Offering Executive.  Lamm is currently working as HyperGiant's President and Chief Executive Officer.

14.    John C. Fremont is a former Accenture Managing Director, who served as a Digital Transformation Executive.  Fremont is currently employed by HyperGiant.

15.    Will A. Womble is a former Accenture Managing Director who served as Sales Lead at Accenture.  Womble is currently employed by HyperGiant.

---

[1]    Accenture and Todor are parties to an Arbitration Agreement, but that agreement expressly authorizes Accenture to secure temporary and preliminary injunctive relief in a court of competent jurisdiction.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1367. Accenture's claims arise, in part, under federal law, specifically the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq*.  Additionally, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Accenture's state law claims because all of the claims are so related to each other that they form part of the same case or controversy.  This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The amount in controversy for each claim exceeds $75,000 exclusive of interest and costs, and Accenture, unlike every Defendant, is not a citizen of Texas; thus complete diversity of citizenship exists.

17.     This Court has personal jurisdiction over Defendants because they are citizens of Texas, misappropriated Accenture's trade secrets in Texas, committed tortious acts against Accenture in Texas, and breached contractual obligations owed to Accenture in Texas.

18.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events giving rise to these claims occurred in this district, including Defendants' misappropriation of Accenture's confidential, proprietary, and trade secret information.  Venue is also proper in this district as all Defendants reside in this district.

## FACTUAL BACKGROUND

### Accenture's Business

19.     Accenture is a leading global professional services company providing a range of strategy, consulting, digital, technology, and operations services and solutions.

20.     Accenture develops and delivers integrated services and solutions for its clients through its five businesses, including Accenture Digital.  Accenture Digital combines Accenture's capabilities in interactive, digital marketing, analytics, and mobility to help its clients use digital technologies to deliver more meaningful and relevant customer experiences

across all channels and customer segments, as well as to create new products and business models and to optimize the efficiency and effectiveness of their internal operations.

21.     Accenture Interactive, part of Accenture Digital, works with leading brands to drive superior design, content, commerce, and marketing performance across the full multichannel customer experience.  Recognized as one of the world's largest and fastest-growing digital agencies, Accenture Interactive offers integrated, industrialized, and industry-driven digital design transformation and marketing solutions to capitalize on opportunities emerging as a result of increased digital interactions.

22.     Accenture has invested hundreds of millions of dollars in recent years to build and to strengthen Accenture Interactive's design capabilities, including the 2013 acquisition of Fjord ("Fjord" or "Accenture Fjord"), a global service design and innovation consultancy that specializes in creating wide-ranging digital experiences and services for consumers across platforms including smart devices, tablets, and PCs.

23.     Fjord, which now operates as the design and innovation unit within Accenture Interactive, leverages its extensive design and innovation capabilities and robust methodologies to create and deliver on complex strategy and service design and digital products.

24.     Accenture Interactive and Fjord's digital solutions and products integrate multi-faceted artificial intelligence, which is a collection of advanced technologies that allows machines to sense, comprehend, act, and learn.  For example, machine learning is an artificial intelligence technology that provides systems with the ability to learn without being explicitly programmed.  Integrated analytics provide a basis on which data sets can be harnessed by machine learning algorithms to adapt and improve their performance.  Biometrics is another artificial intelligence application that gives intelligent systems the ability to gather data on facial

features and other demographics.  Robotic process automation allows organizations to deploy intelligent software systems that mimic the actions of human users.  These intelligent systems interpret existing applications to process transactions, manipulate data, and communicate with other systems.

25.     In Defendant Boudria's own words: "AI [artificial intelligence] will impact EVERYTHING. . . . The risk that your competition will get it right and have created 'magic' is very real, and that risk alone changes the competitive environment." https://www.fjordnet.com/conversations/brands-bots-beyond/.

26.     Accenture Interactive and Fjord's creation of groundbreaking digital services and products, which often integrate a variety of types of artificial intelligence, requires intense, long-term research and development efforts.  Significant resources are devoted to developing and testing source code and product architectures and extensive prototyping, which are integral to the process of conceptualizing, refining, and finalizing an inventive solution, service, or product.

27.     Accenture has expended, and continues to expend, millions of dollars and countless resources developing, maintaining, and updating the proprietary, confidential, and trade secret information used in Accenture Interactive and its Fjord unit, including, but not limited to: source code; coding conventions, standards, patterns, and libraries; software architectures; product design and development, product prototypes and demos; know-how; research and development; marketing plans and strategies; techniques and methods; and customer information.

28.     Such confidential, proprietary, and trade secret information is not known in the industry or by the general public.  It would be extremely difficult for a competitor to either acquire or reverse-engineer Accenture's confidential information using publicly-available sources.  Use of

Accenture's confidential information by competitors in the industry would negatively impact the competitiveness of Accenture's design and innovation business and cause irreparable harm.

**Accenture Has Enacted Significant Measures to Safeguard its Sensitive Information**

29.     Accenture's confidential, proprietary, and trade secret information is critical to its success, and Accenture has enacted significant measures to safeguard the confidentiality of such information.  Accenture requires all employees to sign intellectual property agreements, which include provisions prohibiting the improper use or disclosure of confidential information.  The intellectual property agreements also require employees to assign to Accenture all intellectual property rights to any inventions, intellectual property, materials, documents, or other work product created, developed, or improved by the employee at any time during their Accenture employment and within the scope of such employment and/or with the use of any Accenture resources.

30.     In addition, Accenture requires employees to have an electronic proximity access card for physical building access; restricts access to confidential information to only those employees with a need to know such information; restricts computer access by user name and password and multi-factor authentication tokens; and restricts access to certain areas of its facility to authorized employees only.  Accenture employees also receive annual mandatory training on information security.

31.     Accenture has also implemented and maintained numerous policies outlining its security measures and expectations concerning privacy and communications.  For instance, Accenture's Confidentiality Policy provides, in part:

> Employees shall protect confidential information that is entrusted to them or to which they are otherwise exposed.  Employees may not use or disclose any confidential Company, client, or third-party information to anyone outside the Company, except as authorized. Under no circumstances may an employee discuss with clients matters that concern other clients or engagements without the

express authorization of such other clients.

Within the Company, disclosures of confidential information should occur only on an as-needed basis, and when such discussions are necessary, they should never be held in a public place . . . under circumstances where they could be overheard.  If an employee leaves the Company for any reason, he/she must return all Company and client or third-party materials acquired during his/her association with the Company. An employee's obligations with respect to confidential information apply even after association with the Company ends.[2]

### Accenture Acquires Chaotic Moon

32.     To meet rapidly increased market demand in differentiated customer experience, digital product creation, and the evolution of artificial intelligence and augmented reality, Accenture has devoted significant resources to expand its design and innovation capabilities.

33.     On July 21, 2015, Accenture strengthened its full suite of marketing and digital services by acquiring Chaotic Moon, a creative technology studio based in Austin, Texas.  The multi-million dollar acquisition of Chaotic Moon, which excelled in digital design, prototyping, experience strategy, and development, provided Accenture with expanded rapid prototyping and creative technology capabilities.  In the fall of 2016, Chaotic Moon was absorbed into Fjord, and now continues its operations in Austin, Texas as Fjord Austin.

### Defendants' Employment with and Contractual Obligations to Accenture

34.     In connection with the Chaotic Moon acquisition, Accenture extended offers of employment to most of Chaotic Moon's employees, including Lamm, Fremont, Womble, and Defendants.

35.     Lamm began his employment at Accenture as a Managing Director in the role of Digital Practice and Offering Executive and continued to be considered within Accenture as the CEO of Chaotic Moon.  Fremont was also hired by Accenture as a Managing Director in the role

---

[2]     A true and correct copy of Accenture's Confidentiality Policy is attached hereto as Exhibit A.

of Digital Transformation Executive.  Womble was hired by Accenture as a Sales Lead and, in the course of his Accenture employment, ascended to a Managing Director position.

36.     Defendant Boudria was hired into a Research and Development Lead role, and, during his Accenture employment, served as a member of the Marketing Team and Go-to-Market Team.

37.     Murray was hired into a Research and Development Lead role, and, during his Accenture employment, served as a member of the Marketing Team.

38.     In Boudria's and Murray's roles, they were at the forefront of Fjord's research and product development efforts.  Boudria and Murray engaged in initial ideation and concepts; formulated and refined design concepts and recommendations; assessed clients' technology systems to make recommendations on approach and technological architecture; and, using source code developed by Boudria and Murray, developed demos and created functional hardware and software prototypes for clients and for Accenture marketing purposes.

39.     Defendant McIntyre began his Accenture employment as a Product Strategy Lead.  In this role, McIntyre focused on bringing innovative work to Fjord, especially that which focuses on digital product creation and emerging experiences.  McIntyre helped determine Fjord's strategic pursuits and created tactical long- and short-term roadmaps.  He also conducted market, product, landscape and competitive research, auditing, and analyses, and was an active contributor to proposals, pitches, and presentations to Fjord's current and prospective clients.

40.     Todor began his Accenture employment in the role of Senior Sales Manager.  In this capacity, Todor maintained close relationships with Chaotic Moon's and Accenture's clients and prospective clients; identified business opportunities; identified potential prospects; and developed and implemented sales strategies.  He also conducted market, product, landscape and

competitive research, auditing, and analyses, and was an active contributor to proposals, pitches, and presentations to Fjord's current and prospective clients.

41.     The Defendants were all well-compensated by Accenture.  Over the course of their Accenture employment, the Defendants' annual base salaries rose to: Todor, $165,400 (and an additional $270,000 in compensation on top of his salary); Boudria, $108,900 (and an additional $50,000 in compensation on top of his salary); McIntyre, $152,600; and Murray, $115,300.

42.     In their positions, and as part of agreeing to their Conditions of Employment Agreements and Intellectual Property Agreements, Defendants were entrusted with significant amounts of Accenture confidential, proprietary, and trade secret information, including information relating to source code; product development; technological research; product marketing and sales strategies; client lists; client engagements; and project profits and pricing.  If a competitor had access to this information, it could potentially use such information to destroy the competitive advantage that Accenture has spent years and tens of millions of dollars acquiring and developing.  Indeed, with access to such information, a competitor would have the ability to map out the overall workings of Accenture's design and innovation unit and could replicate the very technology and design strategies that are the core of that unit.

43.     In October 2015, Accenture formally extended offers of Accenture employment to the Defendants.  As made clear in the offer letters, Defendants were each required to sign a Conditions of Employment Agreement and an Intellectual Property Agreement as a condition of employment.

44.     Defendants each accepted Accenture's offer by countersigning their offer letters. By executing the offer letters, Defendants agreed as follows:

During your employment or upon your release or resignation, you agree not to release, retain, copy or utilize in any manner any confidential, privileged, or proprietary information or property of Accenture or its clients.  All discoveries, inventions, or techniques developed in the course of your employment belong to Accenture and will be disclosed and assigned to Accenture by you.

45.     In connection with their Accenture employment, each of the Defendants also signed, among other things, a Conditions of Employment Agreement and an Intellectual Property Agreement.[3]

46.     In executing the Conditions of Employment Agreements, Boudria, McIntyre, and Murray agreed to abide by a one-year client non-solicitation obligation as follows:

If you leave Accenture, for 12 months after release or resignation, you agree not to, directly or indirectly, perform professional services for, or solicit for the purpose of performing professional services for: (a) any client of Accenture for whom you performed professional services during the 18 months prior to release or resignation; and (b) any prospective client of Accenture (any person or entity to which you submitted a proposal concerning which you assisted in the preparation or submission of a proposal during the 18 months prior to release or resignation). For purposes of this agreement, professional services means services that are the same or substantially similar to the services you provided while at Accenture.

47.     The Conditions of Employment Agreements signed by Boudria, McIntyre, and Murray also contained an eighteen-month employee non-solicitation clause as follows:

During your employment with Accenture and for 18 months thereafter, you agree not to (i) directly or indirectly, recruit, solicit or otherwise induce any Accenture personnel to end their relationship with Accenture or (ii) interfere with the performance by any such persons of their duties for Accenture.

48.     In executing the Conditions of Employment Agreements, Boudria, McIntyre, and Murray agreed to certain non-disclosure obligations, as follows:

Upon your release or resignation, you agree not to release, retain, copy or utilize any confidential, privileged, or proprietary information or property of Accenture or its clients.  All discoveries, inventions, or techniques developed in the course of

---

[3]     True and correct copies of Defendants' signed offer letters, Intellectual Property Agreements, and Conditions of Employment Agreements are attached hereto as Composite Exhibits B through E.

your employment with Accenture belong to Accenture and will be disclosed and assigned to it by you.

49.     Todor's Conditions of Employment Agreement, governed by New York law, also

contained a one-year client non-solicitation obligation as follows:

> If you leave Accenture, for 12 months after release or resignation, you agree not to, directly or indirectly, perform professional services within the territory for, or solicit for the purpose of performing professional services for: (a) any client of Accenture for whom you performed professional services during the 18 months prior to release or resignation; and (b) any prospective client of Accenture, "prospective client of Accenture" is defined as any person or entity to which you submitted a proposal concerning which you assisted in the preparation or submission of a proposal during the 18 months prior to release or resignation.

50.     In executing the Conditions of Employment Agreement, Todor also agreed to a

one-year employee non-solicitation clause as follows:

> During your employment with Accenture and for 12 months thereafter, you agree not to (a) directly or indirectly, recruit, solicit or otherwise induce any Accenture employee or any Accenture contractor to end their relationship with Accenture or (b) interfere with the performance by any such persons of their duties for Accenture.

51.     In signing the Intellectual Property Agreements, Boudria, McIntyre, and Murray

agreed to further non-disclosure restrictions:

> Unless I first secure the written consent of Accenture, I shall not use, divulge, disclose, communicate, reveal, share, provide access to, transfer, copy, distribute or publish any Confidential Information at any time, either during or after my employment by Accenture, except to partners, employees or authorized agents of Accenture, and solely to the extent I must do so to perform my assigned duties for Accenture.

> Upon the expiration or termination of my employment with Accenture for any reason (i) I shall cease and not thereafter commence any and all use of Confidential Information and Accenture Works (as defined in Section 2(a)), and (ii) at any time upon Accenture's request, I shall promptly, at Accenture's option, deliver to Accenture or destroy, delete or expunge all originals and copies of any Confidential Information in any form or medium in my possession or control (including any of the foregoing stored or located in my office, home, laptop or other computer that is not Accenture property) and shall notify and fully

cooperate with Accenture regarding the delivery or destruction of any other Confidential Information of which I am aware.

52.     Todor's Intellectual Property Agreement, governed by New York law, similarly provided:

Unless I first secure the written consent of Accenture, I (1) shall use, access or copy Confidential Information at any time only as required to perform my assigned duties for Accenture and (2) shall not disclose, communicate, share, provide access to, transfer, or otherwise make available any Confidential Information at any time, either during or after my employment by Accenture, except to partners, employees or authorized agents of Accenture, and solely to the extent I must do so to perform my assigned duties for Accenture.

Upon the expiration or termination of my employment with Accenture for any reason (or at any earlier time at Accenture's request), (1) I shall cease and not thereafter commence any and all use of Confidential Information and Accenture Works (as defined in Section 2(a)), and (2) I shall promptly, at Accenture's option, deliver to Accenture or destroy, delete or expunge all originals and copies of any Confidential Information in any form or medium in my possession or control (including any of the foregoing stored or located in my office or home or on a laptop, tablet computer, smartphone, storage device or any other device that is not Accenture property returned to Accenture) and shall notify and fully cooperate with Accenture regarding the delivery or destruction, deletion or expunging of any other Confidential Information of which I am aware.   If, notwithstanding the foregoing, I use Confidential Information after the period of my employment by Accenture in the Creation (as defined in Section 2(a)) of any Works (as defined in Section 2(a)), either alone or with others, such Works shall constitute Accenture Works and shall be owned solely by (and are hereby assigned, transferred and conveyed to) Accenture, as described in Section 2(a).

53.     "Confidential Information" is defined in the Intellectual Property Agreements to include all confidential, propriety or non-public information, ideas, concepts, techniques, methods, processes, plans, strategies, know-how, materials and documents relating to or concerning the past, present, or future business activities and operations of Accenture, including, without limitation, products, services, sales, marketing, client identities, and details of specific client engagements.  *See* Intellectual Property Agreements, ¶ 1(a).

54.     In signing the Intellectual Property Agreements, the Defendants agreed to comply

with all Accenture policies and guidelines regarding the protection of Confidential Information and intellectual property.  *See* Intellectual Property Agreements, ¶ 3(c).

55.     Accenture is entitled to injunctive relief in the event of a breach of the Intellectual Property Agreements by Defendants, each of whom specifically acknowledged that a material breach would irreparably harm Accenture, and Accenture would not have an adequate remedy at law.  Therefore, Defendants agreed that, in such event, Accenture may obtain injunctive relief, without posting of bond or other security, in addition to any other remedies Accenture may have. *See* Intellectual Property Agreements, ¶ 4(b).

56.     In addition to the confidentiality obligions in the Intellectual Property Agreements, Defendants also expressly agreed to abide by ongoing confidentiality obligations within Accenture's HR Policies, including its Confidentiality Policy, by executing an HR Policies Acknowledgement Form in November 2015.[4]

57.     Defendants' executions of the Conditions of Employment Agreements and the Intellectual Property Agreements were knowing, willful, and informed.

58.     Accenture has fully performed all of its obligations to Defendants, including all conditions precedent under the Conditions of Employment Agreements and the Intellectual Property Agreements.

59.     The Conditions of Employment Agreements and the Intellectual Property Agreements are supported by adequate consideration, are reasonable in scope, and are not more extensive than is reasonable and necessary for Accenture to protect its legitimate business interests, including but not limited to its confidential information and trade secrets, stable workforce, client relationships, and goodwill.

---

[4]     True and correct copies of Defendants' signed Policies Acknowledgement Forms are attached hereto as Composite Exhibit F.

60.     At the time they were executed, the Conditions of Employment Agreements were ancillary to or part of Defendants' employment with Accenture and Accenture's promise to provide Defendants access to confidential, proprietary, and trade secret information and exposure to Accenture's clients, all of which Accenture in fact provided to Defendants.

### Departures from Accenture

61.     Lamm separated from Accenture on or about January 8, 2016.

62.     Womble separated from Accenture on or about January 25, 2017.

63.     Fremont resigned from Accenture without notice effective July 21, 2017.

64.     On September 1, 2017, Boudria, Murray, and Todor—highly valuable employees within Accenture Fjord—all came into the office, typed out departure emails, and unexpectedly and suddenly walked out the door, resigning without notice.  McIntyre resigned without notice on September 5, 2017.  Boudria, McIntyre, Murray, and Todor all failed to provide Accenture with any information regarding their future employment plans.

65.     The Defendants, along with Lamm, Fremont, and Womble, have reunited at HyperGiant, an artificial intelligence consultancy competing with Accenture in the digital consulting and innovation space.  Lamm serves as HyperGiant's President and CEO.  The Defendants, as well as Fremont and Womble, serve in high-level research and development, strategy, sales, and marketing roles at HyperGiant.

### Accenture's Investigation to Date Reveals
### Conspiracy to Form Competing Company

66.     Following the mass and sudden resignations of Defendants, and notice that its clients were being solicited by Defendants, Accenture promptly launched an investigation.

67.     Accenture's investigation is ongoing, but it has revealed, among other things, the direct theft of trade secrets by Defendants, as well as voluminous communications among the

Defendants and their co-conspirators in furtherance of their scheme.  They attempted to hide these communications by conducting them on what they thought was a secret communication site inaccessible to Accenture.  Defendants then sought to destroy evidence of those communications, but Accenture was able to find some of them through its forensic review.

68.     The evidence obtained to date reveals a covert and concerted effort involving Lamm, Fremont, Womble, Defendants, and others, acting in concert with one another, to begin what they called a "stealth" startup technology company, HyperGiant, to compete directly with Accenture, to solicit its employees, to solicit its clients, and to steal its confidential information and trade secrets, all in conscious disregard of the contractual, common law, and statutory duties owed to Accenture.

69.     Beginning in late January and early February 2017, McIntyre, Womble, Boudria, and Todor commenced discussions concerning their desire to leave Accenture and begin competing with it.  In a February 5, 2017 communication to Womble, McIntyre stated that he, Boudria, and Todor are "ready to break out with you and start our own agency," which Todor had suggested they name the "Bro-ligarchy."

70.     The Defendants, in concert with Lamm and Womble, continued to coordinate their departure and competition with Accenture in the following months.  Indeed, the iMessage conversations reveal the following (as detailed in Paragraphs 71–85, 87–94, *infra*):

71.     On April 21 and 22, 2017, McIntyre invited a current Innovation Account Manager at Accenture (the "Manager"), to join the scheme of departing Accenture and working at a competing firm with Lamm.  McIntyre encouraged the Manager to join, "Let's go make with the sorcery," to which the Manager responded, "I'm in all the way."  McIntyre told the Manager that "Boudria is the only remaining element."   The Manager responded, "He needs to be

protected and empowered. We need to create the space for him to perform and he'll be on board. . . . [W]e need to take care of each other. This is gonna take some grit."  McIntyre responded: "We are gonna have to be aggressive."

72.     On April 25, 2017, McIntyre and the Manager discussed pitching innovation proposals to artificial intelligence executives, who could serve as angel investors in the startup. McIntyre and the Manager then turned back to planning their departures from Accenture, with McIntyre saying, "Extracting ourselves from Fjord will likely prove challenging."  The Manager responded, "We wouldn't right away. We would prove we could make it work in fjord first. Then have an expansion plan . . . I love this. It's so fun."

73.     On May 9, 2017, Boudria spoke to Lamm and agreed to meet with Lamm in his offices the following Monday to learn about opportunities at another of Lamm's new companies, Conversable, an artificial intelligence-driven software company.  Boudria then sent a message to McIntyre regarding their plan to leave Accenture and join Lamm, stating, "There is nothing that stops us from bring[ing] [Lamm's] solutions to our clients" and that he and McIntyre could use their positions at Accenture "to let [their] clients know about that [*i.e.*, Lamm's] technology and loop them in."

74.     Making their motivations clear, Boudria then added that he and McIntyre would "get taken care of on the backside" because it is "time for our piece of the f--king pie,"[5] and that they could sell Lamm's competing technology to Accenture clients.  They further set out their plan to solicit Accenture clients by writing that they could sell the other company's technology to specific, listed Accenture clients "right now."

---

[5]     This quote has been modified only to remove the writer's profanity.

75.     The Defendants, in coordination with Lamm and Womble, continued to plan their scheme through the summer.  McIntyre talked to Todor on June 19, 2017, and reported back to Womble that Todor was "eager to hear more about the Next Big Thing."  Womble then invited McIntyre on June 21 to attend a previously-scheduled meeting for the next day with Lamm, adding that it "will all make sense tomorrow."  Later that day, McIntyre reported to Boudria, "Now, the only issue is salary."

76.     McIntyre then set out to recruit Tom Rivituso ("Rivituso")—a Los Angeles-based product manager working for a separate digital agency with whom McIntyre had worked previously—to join the HyperGiant team by setting up a call with Womble.  McIntyre offered to be on the call, to which Womble—a licensed Texas attorney—responded, "Let's you and I visit first via phone before we proceed.  I see great value in you being on call, but also want to protect us legally."

77.     Later that day, McIntyre contacted Rivituso and said he (McIntyre) was "joining a startup that I want you to be part of" based in Austin, Texas that is an "AI [Artificial Intelligence] consultancy."   Continuing their pattern of hiding their plans, after Rivituso responded that he may be interested, McIntyre stated, "Excellent. I'll try to figure out next steps. It's all very DL [down low] for now for a variety of reasons."  McIntyre then told Rivituso to give his name, number, and email address to Womble, cautioning, "But it's all extremely confidential right now, so use utmost discretion."

78.     On June 27, McIntyre, Boudria, and Todor met with Womble to discuss follow-up questions about the HyperGiant formation.

79.     The next day, McIntyre asked Womble whether he should book a trip to the annual Accenture Fjord conference being held in Berlin the week of September 11.  McIntyre,

referencing an apparent effort to undermine Accenture, asked Womble, "Book and cancel or just divert and distract?"  Womble responded, "If timing sucks for Acn [Accenture] when we go . . . they can jump in a lake."

80.     In July 2017, the Defendants circulated work product materials for HyperGiant. On July 3, 2017, McIntyre sent Womble what he described as a "rough example of a deliverable shell" and said he would be working further on it with Boudria and a current Digital Experience Architect (the "Architect") in Accenture Fjord.  On July 7, McIntyre followed up to ask if Womble had reviewed the document, and Womble replied that he would "review in a bit."

81.     On July 7, Todor set up a call with McIntyre, Boudria, and the Architect, during which McIntyre asked the group to review what are believed to be Accenture materials and said they "can replace temp material with things that are MI [machine intelligence] focused." McIntyre then added that he is "comfortable replacing most of the text with Lorem Ipsum [filler replacement text], too, to further distance from its origins", *i.e.*, to hide the fact that the materials were original Accenture materials.

82.     That day, in an apparent effort to conceal the Defendants' HyperGiant communications, Boudria created and invited the other Defendants, Lamm, Womble, and others to join a private channel on Discord, a text and voice communications application that they believed would keep their communications hidden.

83.     After Boudria suggested that they not use their own names, Defendants, Lamm, and Womble assumed secret code names for themselves in an apparent effort to try to conceal their true identities and hide their plans.  On Discord, Lamm went by the code name "Zeus," Womble went by "Pretty boy," McIntyre was "Beetle," Todor went by "Theyohmbyes," and Boudria was "Gahiji."

84.     The Defendants, Lamm, and Womble continued to work on the HyperGiant document over the next several days, and they continued to have some sporadic discussions via iMessage, an application more accessible to Accenture.  As a reminder to use the secret Discord channel rather than the more open iMessage, Boudria stated to them on iMessage, "Cough use discord cough."

85.     On July 9, McIntyre asked Todor if he had "an updated deck."  Todor responded that he sent it to "Will [Womble] to review first."  When Todor asked McIntyre about his availability to work on the deck the next day, McIntyre responded it was "not something I can realistically work on in the office," but that he may be able to work from home in order to do so. On July 11, Todor told McIntyre that the deck content was "good to go" and that it was saved on Discord (*i.e.*, their secret communications channel).

86.     The preparation to leave Accenture and unlawfully compete intensified in August 2017.  On August 1, 2017, one month prior to Defendants' mass defection, HyperGiant was formed and incorporated under the laws of the State of Delaware.

87.     On August 2, while still an Accenture employee, McIntyre wrote Boudria and stated, "So happy to escape. . . Aside from Ethan and Carley (and obviously those of us leaving), f--k 'em."[6]  Boudria then referenced his lack of effort on behalf of Accenture, remarking, "Yeah we just float at this point that's all I've [been] doing."

88.     On August 5, McIntyre asked Boudria when they should begin discussing salaries with HyperGiant. Boudria suggested having a conversation with Womble and said that he (Boudria) had already spoken with Fremont (who went by the code name "Vikingblood" on the Discord application).  McIntyre then spoke with Todor and said, "it will be interesting to see

---

[6]     This quote has been modified only to remove the profanity of the writer.

what offer letters look like."  Referring to their continuing secrecy, Todor reminded McIntyre, "we need to stay zipped up about HG [HyperGiant]".

89.     That day, Womble—a former Texas assistant district attorney who is, upon information and belief, fully cognizant of the laws surrounding spoliation and the destruction of evidence—instructed Todor to delete any and all HyperGiant correspondence from Womble or Fremont and to remove Womble and Fremont from the Discord channel.

90.     Apparently anticipating future litigation, Womble reasoned that he wanted to cover his tracks "due to Accenture legal paperwork that we all signed."  Womble asked Todor to relay his message that he wanted to "remove himself from the trail."

91.     Todor conveyed Womble's instruction to destroy evidence to Boudria, who inquired as to whether they should "kill the discord channel."  Boudria and Todor agreed it was best to remove Womble and Fremont from the channel so the HyperGiant work residing on the channel would not be lost.  Boudria then removed Lamm from the channel as well.

92.     On August 8, McIntyre continued the solicitation of the Architect (who was then still employed with Accenture) to join the defection, asking the Architect to call him.  McIntyre stated that he wanted to check in and give the Architect updates on HyperGiant.

93.     On August 20, McIntyre asked Womble if he registered the Internet address hypergiant.ai.  Womble responded that he had, and then asked McIntyre if he needed any help communicating with Lamm.  Womble added, "we've got deals coming in. So exciting." McIntyre responded, "Really excited. I'll reach out once the offer letters go out."

94.     On August 21, Lamm, HyperGiant's President and CEO, sent Murray an email attaching a HyperGiant offer letter and wrote, "Matt, it was great chatting with you last week. Thank you again for reaching out. Per our conversation, I would like to offer you a position with

my new stealth startup – HyperGiant."   Lamm then followed up with Murray with a call. McIntyre also received a HyperGiant offer letter on or about August 21.

**Defendants Misappropriate Accenture's
Confidential, Proprietary, and Trade Secret Information**

95.     In furtherance of their intention to join HyperGiant, shortly before abruptly resigning from Accenture, and in violation of their statutory, contractual, and common law duties to Accenture, Defendants began, in concert with HyperGiant, Lamm, Fremont, and Womble, secretly and without authorization to copy, access, and remove various confidential, proprietary, and trade secret materials from Accenture's computer systems, and took active steps to attempt to conceal their unlawful activities.

**Defendant Mark Boudria**

96.     Accenture's ongoing forensic investigation reveals that Boudria downloaded critical Accenture confidential, proprietary, and trade secret information from his Accenture computer before resigning.   On September 1, 2017, the day he abruptly resigned, Boudria plugged a USB device into his Accenture computer and downloaded confidential Accenture information from his Accenture computer to the USB device.   That same day, Boudria also accessed many Accenture documents that had previously been downloaded to the USB device, including highly confidential artificial intelligence information, such as: artificial intelligence source code; artificial intelligence training files; customer information and preferences; and other strategic business information.   By way of example, Boudria accessed a zip file on the USB device that contained psychometric artificial intelligence source code used by Accenture in existing proprietary and commercial applications; artificial intelligence models specifically designed for various software applications; and artificial intelligence training files.   That device

23

was not returned to Accenture, and, upon information and belief, remains in the possession of Boudria.

97.     On the date of his resignation, Boudria also copied from his USB device to his Accenture computer a number of confidential and trade secret documents, including the artificial intelligence source code referenced above and a file detailing Accenture's key strategies and opportunities, and the associated costs and benefits, that Accenture had generated for a certain multi-million dollar per year client.  Shortly thereafter, Boudria permanently deleted over 32,000 files, including documents, system files and digital storage caches, which had the effect of concealing his computer activities.  Accenture believes that Boudria's purpose in copying the USB files to his Accenture computer was to enable him to upload the documents to a cloud storage account where he (or others) could access them from any computer with an internet connection.  Because Boudria took active steps to conceal his activities as described above, however, Accenture's investigation into whether Boudria uploaded the transferred USB files to a cloud storage account remains ongoing.

98.     On this same day, Boudria also deleted his iMessage and Discord communications with the other Defendants.  The ongoing forensic investigation also reveals that Boudria had already performed work for Conversable and HyperGiant prior to his Accenture resignation.  His Accenture computer hosted files linked to a Conversable email associated with Boudria.  Boudria also possessed a link to an online storage application, Box.com, where he appears to have stored Conversable files.  Boudria also accessed a source code hosting online site, Chilligence, which contained HyperGiant source code files that he could access while at work at Accenture.

**Defendant Ross McIntyre**

24

99.     Accenture's ongoing forensic investigation reveals that McIntyre stored Accenture's confidential, proprietary, and trade secret information on iCloud, a personal cloud storage application, and on his personal external storage devices.  This information includes a zip file of Accenture's pricing and other financial information, customer information and preferences, know-how, research and design, business methods, strategies, and processes.  One of these files was a comprehensive 128-page overview of an Accenture Fjord client engagement, which included proprietary research and analysis and concept and prototype strategies.  McIntyre also possessed a file named "Strategy Template.xlsx," which contains Accenture's confidential, proprietary, and trade secret pricing information.  McIntyre's personal external storage devices were not returned to Accenture, and, upon information and belief, the devices remain in the possession of McIntyre.  Accenture does not have access to McIntyre's iCloud account, which, upon information and belief, remains in control of and accessible to McIntyre.

100.    McIntyre also appears to have begun working for HyperGiant before he left Accenture.  McIntyre's Accenture computer also contained documents that appear to reflect such work on behalf of HyperGiant, including:

"HG_Content"

"Keynote\Documents\Hypergiant_DeliverablePrototype.pdf"

"HG_McIntyre_082217.pdf"

"HG_Content_Good Quality.pdf."

101.    A number of the HyperGiant-related documents located on McIntyre's Accenture-issued computer were created by wrongful repurposing of Accenture documents containing confidential and/or trade secret information.

102.    The documents titled "HG_Content" and "HG_Content_Good Quality.pdf"—each of which contains an Accenture copyright designation—were 130-page strategy documents that were built upon a pre-existing Accenture final strategy presentation for a large Accenture client.  This Accenture final strategy presentation contained Accenture trade secret information, including client technology strategies and operational capability information.

103.    In July 2017, while working at Accenture, McIntyre also accessed a file titled "HyperG Phase Breakdown.docx," which is a comprehensive breakdown of each phase of a project lifecycle, including: strategic assessment; data identification, analysis, and operationalization; and delivery oversight.

**Defendant Mathew Murray**

104.    Accenture's ongoing forensic investigation reveals that on August 22 and 23, 2017, shortly before his sudden resignation, Murray used two external hard drives to create backups of all of the Accenture information on his computer, which included significant amounts of Accenture's proprietary, confidential, and trade secret information.  Analysis of his Accenture computer appears to show mass copying of Accenture data, including folders titled "Development, Documents, and Projects," on August 23, 2017.  When he resigned, Murray claims to have turned in one backup drive.  Even if this is true, however, upon information and belief, he remains in possession of four devices, including a drive containing what appears to be a backup of his Accenture computer.

105.    On August 21, 2017, Murray transferred Accenture source code to Digital Ocean, a third-party hosting provider, without authorization by Accenture.  Upon information and belief, Murray remains in possession of this Accenture source code, which would be highly valuable to HyperGiant.

106.     Murray used at least five methods of communications with the other Defendants: Polymail; iMessage; HipChat; personal email; and Discord.   The majority of the actual communications were deliberately deleted prior to Murray's departure, consistent with Boudria's direction that he destroy all communications evidence.

**Defendant John Todor**

107.     Forensic analysis reveals that Todor likewise misappropriated Accenture's confidential, proprietary, and trade secret information.   On August 29, 2017, three days before his Accenture resignation, Todor connected an external device he named "xo terabyter," to his Accenture-issued computer.   Todor's own external device contained several documents reflecting Accenture's trade secret and confidential sales, business, and financial information.

108.     In addition, it has been reported to Accenture that two weeks prior to Todor's Accenture departure, he instructed an Accenture marketing associate to provide a report to him of all Accenture Fjord clients.   This client information is maintained as highly-sensitive data. Indeed, Accenture tracks all individuals who access the data.

109.     Todor also used a number of communication applications to communicate with the other Defendants regarding HyperGiant.   He used HipChat, Skype, iMessage, and Discord for this purpose.   On Aug. 5, 2017, Todor instructed McIntyre, Murray, and Boudria to delete their communications, to get off of Discord, and to delete data to conceal their activities.

110.     Prior to his departure from Accenture, however, he deleted these communications from his Accenture computer in an apparent effort to conceal his activities.

111.     Immediately before leaving, Todor also deleted 15,000 computer files on his Accenture work computer.

**All Defendants**

112.     Defendants had no legitimate purpose for seeking reports on and downloading and transferring to personal storage devices Accenture's confidential, proprietary, and trade secret information in anticipation of their departures from Accenture.

113.     This information would be of great value to Accenture's competitors, including HyperGiant.

114.     Upon information and belief, Defendants remain in possession of Accenture's confidential, proprietary, and trade secrets that they accessed and retained without authorization and are using such information in connection with the business of HyperGiant.

**Defendants Exploit Accenture's Confidential, Proprietary, and Trade Secret Information to Solicit Accenture Clients in Breach of Contractual Obligations**

115.     In their employment with HyperGiant and in coordination with HyperGiant, Lamm, Fremont, and Womble, Defendants have solicited and are actively soliciting Accenture clients in breach of the client non-solicitation obligations in their respective Conditions of Employment Agreements and are utilizing and exploiting Accenture's confidential, proprietary, and trade secret information in doing so.

116.     Indeed, Accenture was informed that two weeks prior to his Accenture departure, Todor instructed a marketing associate to run a report on all Accenture Fjord clients.  Upon information and belief, Todor did this with the intention of providing the list to HyperGiant and has in fact done so.

117.     On September 7, 2017, not even a full week after his abrupt resignation from Accenture, Todor solicited a very significant, multi-million dollar client of Accenture Fjord on

behalf of HyperGiant.  Todor had worked with this client and received Accenture confidential information regarding the client while employed at Accenture.  Furthermore, Todor had absconded with Accenture confidential, proprietary, and trade secret information related to this client when he stole Accenture information as described above.  In the September 7, 2017 correspondence, Todor wrote, "Last Friday was my last day at what was formerly known as Chaotic Moon.  A core group of us (and growing) have broken off to form a new company called HyperGiant.  Do you have some time in the next few weeks to hear our elevator pitch?"

118.    Defendants' improper solicitation of Accenture clients is ongoing.  For example, Accenture recently learned that Boudria, on behalf of HyperGiant, and, upon information and belief, in coordination with Defendants, submitted a competitive proposal for an artificial intelligence project of a multi-million dollar Accenture client.  As a result, Accenture was forced to significantly lower its pricing and make other concessions to retain this project.  Boudria, who knows Accenture Fjord's pricing, worked on this project for months while employed with Accenture.  When Boudria abruptly resigned from Accenture, he absconded with confidential and proprietary documents relating to this major client.

119.    The continued improper solicitation of Accenture clients by Defendants puts Accenture's legitimate protectable interests at grave risk, including its confidential information, trade secrets, goodwill, and customer relationships.

120.    The continued improper solicitation of Accenture's clients by Defendants has caused and will continue to cause irreparable harm for which no adequate remedy at law exists.

121.    As a direct and proximate result of Defendants' breach of their Conditions of Employment Agreements as described above, Accenture has suffered and will continue to suffer substantial injuries and damages.

**Defendants Solicit Accenture Employees in Breach of Contractual Obligations**

122.    Defendants' improper solicitation of Accenture employees, in coordination with HyperGiant, Lamm, Fremont, and Womble, as set forth in detail above, has been extensive and is ongoing.  Indeed, in Todor's September 7, 2017 unlawful solicitation of an Accenture client, described above, Todor boasted that a core group, "and growing," of what was Chaotic Moon have broken off into HyperGiant.

123.    Accenture's ongoing forensic investigation has uncovered that Lamm, upon information and belief in coordination with Defendants, recently solicited Jesse Sims, then an Accenture Fjord Art Director, to join HyperGiant.  As a direct result of this solicitation, Sims announced his departure from Accenture on September 26, 2017, with his resignation effective September 29, 2017.  Unearthed iMessage chat conversations reveal that Lamm instructed Sims to not disclose to anyone at Accenture that Sims was going to work for HyperGiant.

124.    Moreover, Lamm, upon information and belief in coordination with Defendants, very recently successfully solicited an Accenture Fjord Art Director, Chris Klee, to join HyperGiant.  Two days after Klee was offered a position at HyperGiant, he tendered his Accenture resignation.

125.    Lamm, upon information and belief in coordination with Defendants, also recently unsuccessfully attempted to recruit and hire an Accenture Fjord Content Design Lead.

126.    The continued improper solicitation of Accenture employees by the Defendants puts Accenture's legitimate protectable interests at grave risk, including its confidential information; trade secrets; goodwill; customer relationships; and its interest in maintaining a stable workforce of employees, particularly in its Austin office.

127.    The continued improper solicitation of Accenture's employees by Defendants has caused and will continue to cause irreparable harm for which no adequate remedy at law exists.

## COUNT I
### MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT
### 18 U.S.C. § 1831 *et seq.*

128.    Accenture realleges and restates all prior paragraphs as if fully restated herein.

129.    As set forth above, Defendants have improperly acquired, remain in possession of, used, and disclosed certain confidential and proprietary information of Accenture constituting "trade secrets" as defined by 18 U.S.C. § 1839(3), including source code, product development plans, product prototypes, pricing information, and client proposals.  These trade secrets have been used in and/or were intended for use in interstate and/or foreign commerce.  Accenture is the licensee of such information.

130.    Accenture has taken reasonable precautions to protect and to maintain the value of its trade secrets, including as described above.

131.    Accenture's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors who can obtain economic value from the disclosure or use of the information.

132.    Defendants' improper acquisition and/or unauthorized use or disclosure, actual or threatened, violates the Defend Trade Secrets Act ("DTSA").

133.    Defendants stood in a position of trust to Accenture and had contractual and legal duties to refrain from disclosing or using for their benefit, or that of a third party, Accenture's trade secrets.  These duties arose from, among other things, Defendants' Intellectual Property Agreements, the Conditions of Employment Agreements, the fiduciary duties Defendants owed to Accenture, and Accenture's policies.

134.    Defendants acquired Accenture's trade secrets through improper means, including by theft.  Defendants' acquisition of Accenture's trade secrets through improper means was not

authorized by Accenture and violated Defendants' fiduciary and contractual duties, Accenture's policies, and the DTSA.

135.    Defendants have improperly acquired, used, disclosed, or threatened to acquire, use, or disclose Accenture's trade secret information with full knowledge that this information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use and was acquired by improper means.

136.    Accenture has suffered and will continue to suffer damages and irreparable harm as a direct and proximate result of Defendants' misappropriation of Accenture's trade secrets. As a direct and proximate cause of Defendants' misappropriation of Accenture's confidential and proprietary trade secrets, Defendants have been unjustly enriched and Accenture has sustained damages in an amount to be proven at trial.  In lieu of damages measured by any other methods, the damages caused by Defendants' misappropriation may also be measured by imposition of a reasonable royalty.

137.    Defendants' conduct constitutes willful and malicious misappropriation within the meaning of the DTSA.  In wrongfully and intentionally misappropriating and threatening to misappropriate Accenture's trade secrets as outlined above, Defendants have demonstrated specific intent to cause substantial injury or harm to Accenture.  As such, Accenture is entitled to an award of exemplary damages and an award of its reasonable attorneys' fees pursuant to the DTSA.

138.    Unless Defendants are preliminarily and permanently enjoined from misappropriating, and/or threatening to misappropriate Accenture's trade secrets, Accenture will suffer irreparable harm for which there is no adequate remedy at law.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION**
**OF THE TEXAS UNIFORM TRADE SECRETS ACT**
**TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq.***

139.     Accenture realleges and restates all prior paragraphs as if fully restated herein.

140.     As set forth above, Defendants have improperly acquired, remain in possession of, used, and disclosed certain confidential and proprietary information of Accenture constituting "trade secrets" as defined by the Texas Uniform Trade Secrets Act ("TUTSA"), TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq.*, including source code, product development plans, product prototypes, pricing information, and client proposals.

141.     Accenture's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, persons and entities in the competing market who can obtain economic value from their disclosure or use.

142.     Accenture's trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy and confidentiality, including as described above.

143.     Defendants' improper acquisition and/or unauthorized use or disclosure, actual or threatened, violates the TUTSA.

144.     Defendants stood in a position of trust to Accenture and had contractual and legal duties to refrain from disclosing or using for their benefit, or that of a third party, Accenture's trade secrets.  These duties arise from, among other things, Defendants' Intellectual Property Agreements and Conditions of Employment Agreements, the fiduciary duties Defendants owed to Accenture, and Accenture's policies.

145.     Defendants acquired Accenture's trade secrets through improper means, including by theft.  Defendants' acquisition of Accenture's trade secrets through improper means was not

authorized by Accenture and violated Defendants' fiduciary and contractual duties, Accenture's policies, and the TUTSA.

146.    Defendants have improperly acquired, used, disclosed, or threatened to acquire, use, or disclose Accenture's trade secret information with full knowledge that this information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use and was acquired by improper means.

147.    Accenture has suffered and will continue to suffer damages and irreparable harm as a direct and proximate result of Defendants' misappropriation of Accenture's trade secrets.

148.    Unless Defendants are preliminarily and permanently enjoined from misappropriating, and/or threatening to misappropriate Accenture's trade secrets, Accenture will suffer irreparable harm for which there is no adequate remedy at law.  Accenture is also entitled to continuing injunctive relief for an additional reasonable period of time in order to eliminate the commercial advantage that otherwise would be derived from the misappropriation and to deter willful and malicious misappropriation.

149.    Pursuant to the TUTSA, Accenture is entitled to recover damages for Defendants' misappropriation in addition to injunctive relief.  Accenture's damages include both the actual loss caused by Defendants' misappropriation, which Accenture shall prove at trial, and also the unjust enrichment caused by Defendants' misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by Defendants' misappropriation may also be measured by imposition of a reasonable royalty.

150.    Defendants' conduct constitutes willful and malicious misappropriation within the meaning of the TUTSA.  In wrongfully and intentionally misappropriating and threatening to misappropriate Accenture's trade secrets as outlined above, Defendants have demonstrated

specific intent to cause substantial injury or harm to Accenture.  As such, Accenture is entitled to an award of exemplary damages and an award of its reasonable attorneys' fees pursuant to the TUTSA.

## COUNT III
### BREACH OF THE INTELLECTUAL PROPERTY AGREEMENTS

151.    Accenture realleges and restates all prior paragraphs as if fully restated herein.

152.    The Intellectual Property Agreements signed by Defendants are valid and enforceable contracts entered into in exchange for good and valuable mutual consideration.

153.    The restrictive covenants in the Intellectual Property Agreements are reasonably necessary to protect Accenture's legitimate protectable business interests, including goodwill, and are reasonable in terms of scope.

154.    Accenture has fully performed every material obligation it owes to Defendants under the Intellectual Property Agreements, including, without limitation, by providing Defendants with the following: (i) continuing employment for significant period of time after the execution of their Intellectual Property Agreements; (ii) confidential, proprietary, and trade secret information; (iii) access to clients; and (iv) compensation and employment benefits.

155.    The Intellectual Property Agreements prohibit Defendants from using, divulging, disclosing, communicating, revealing, transferring, copying, or providing access to Accenture's confidential information, as described in the Intellectual Property Agreements.

156.    Defendants have breached and threaten to continue to breach their Intellectual Property Agreements by using, divulging, disclosing, communicating, revealing, transferring, copying, and providing access to Accenture's confidential information, as that term is defined in the Intellectual Property Agreements.

157.    As a result, Defendants have breached, and will continue to breach, the Intellectual Property Agreements.

158.    Unless Defendants are preliminarily and permanently enjoined from violating the terms of the Intellectual Property Agreements, Accenture will suffer irreparable and incalculable harm, including the loss of proprietary and confidential information for which it can never be compensated.  No adequate remedy at law exists for these breaches.

### COUNT IV
### BREACH OF THE CONDITIONS OF EMPLOYMENT AGREEMENTS

159.    Accenture realleges and restates all paragraphs as if fully restated herein.

160.    The Conditions of Employment Agreements signed by Defendants are valid and enforceable contracts entered into in exchange for good and valuable mutual consideration.

161.    The restrictive covenants in the Conditions of Employment Agreements are reasonably necessary to protect Accenture's legitimate protectable business interests, including goodwill, and are reasonable in terms of scope.

162.    Accenture has fully performed every material obligation it owes to Defendants under the Conditions of Employment Agreements, including, without limitation, by providing Defendants with the following: (i) continuing employment for significant period of time after the execution of their Intellectual Property Agreements; (ii) confidential, proprietary, and trade secret information; (iii) access to clients; and (iv) compensation and employment benefits.

163.    The Conditions of Employment Agreements prohibit Defendants, for a period of one year after the termination of their Accenture employment, from soliciting Accenture clients or prospective clients, as described therein.

164.    The Conditions of Employment Agreements further prohibit Boudria, McIntyre, and Murray, for a period of eighteen (18) months and Todor for a period of one (1) year, after the

termination of their Accenture employment, from soliciting Accenture employees to leave the employ of Accenture, as described therein.

165.     Boudria, McIntyre, and Murray's Conditions of Employment Agreements also prohibit them from, among other things, releasing, retaining, or utilizing any of Accenture's or its clients' confidential information after the termination of their employment.

166.     Defendants have breached and threaten to continue to breach their Conditions of Employment Agreements by, among other wrongful acts: (a) taking part in the ongoing solicitation of Accenture employees; and (b) taking part in the ongoing solicitation of Accenture clients.

167.     Boudria, McIntyre, and Murray have further breached and threaten to continue to breach their Conditions of Employment Agreements by releasing, retaining, and utilizing Accenture's confidential information after the termination of their employment.

168.     Accenture has suffered, and will continue to suffer, damages as a result of Defendants' breaches, as well as irreparable harm, including the loss of goodwill, client relationships, and the stability of its workforce.

169.     Unless Defendants are enjoined from violating the terms of the Conditions of Employment Agreements, Accenture has suffered irreparable harm and, absent injunctive relief, will continue to suffer irreparable and incalculable harm, including the loss of goodwill, client relationships, and the stability of its workforce.  No adequate remedy at law exists for these breaches.

### COUNT V
### BREACH OF FIDUCIARY DUTIES

170.     Accenture realleges and restates all prior paragraphs as if fully restated herein.

171.    Defendants, as employees of Accenture, owed fiduciary duties of loyalty, care, and candor to Accenture.  Accenture placed Defendants in positions of trust and confidence and provided them with protectable, proprietary, and confidential information to use solely in connection with their employment and work on behalf of Accenture's clients and prospective clients.

172.    Defendants' fiduciary duties included the obligation to deal honestly, loyally, fairly, and openly with Accenture, and to not misappropriate confidential information, usurp business opportunities and clients, or to solicit Accenture employees to resign in favor of competitive employment.

173.    Defendants breached their fiduciary duties to Accenture by, while still employed by Accenture: (a) taking, retaining, and disclosing Accenture's confidential information to benefit themselves and other third parties whose business is competitive with that of Accenture; (b) preparing to divert Accenture clients and business to a business competitive with that of Accenture; (c) soliciting, encouraging, or inducing Accenture employees to terminate their employment with Accenture in order to join a business competitive with that of Accenture; and (d) performing services on behalf of a competing entity while employed by Accenture, including using Accenture's resources in doing so.

174.    Defendants' breaches were intentional, willful, and without just cause.

175.    Defendants have benefited from the breach of their fiduciary duties to Accenture and have been unjustly enriched, including by receiving Accenture's proprietary and confidential information, which Defendants are using to develop products and services and to solicit Accenture clients.

176.    By reason of the foregoing, Defendants have directly and proximately caused injury to Accenture, and Accenture has suffered, and continues to suffer, substantial injury as a result of Defendants' actions.

## COUNT VI
## CIVIL CONSPIRACY

177.    Accenture realleges and restates all prior paragraphs as if fully restated herein.

178.    The Defendants knowingly and intentionally acted together for the unlawful purposes of: (a) misappropriating Accenture's confidential and proprietary information in violation of Defendants' legal, contractual, and fiduciary duties; (b) soliciting employees from Accenture in violation of Defendants' contractual and fiduciary duties; and (c) soliciting clients from Accenture in violation of Defendants' contractual and fiduciary duties.

179.    By misappropriating Accenture's confidential and proprietary information and soliciting Accenture employees and clients, Defendants committed unlawful, overt acts in furtherance of Defendants' unlawful objectives.

180.    As a result of the conspiracy and acts in furtherance of the conspiracy, Accenture has been damaged.

## REQUEST FOR JURY DEMAND

181.    Accenture demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Accenture LLP prays for the following relief:

(a)     Judgment in favor of Accenture and against Boudria, McIntyre, and Murray.

(b)     Temporary, preliminary, and permanent injunctions:

(i)     Enjoining Boudria, McIntyre, and Murray, and anyone acting in concert with them, from using, copying, analyzing, or disseminating Accenture's proprietary, confidential, and/or trade secret information in any fashion;

      (ii)    Requiring Boudria, McIntyre, and Murray immediately to return to Accenture all information, data, files, and other property owned by or licensed to Accenture in their possession, custody, or control;

      (iii)   Enjoining Boudria, McIntyre, and Murray, and those acting in concert with them, from breaching their contractual obligations to Accenture as contained in their respective Conditions of Employment Agreements and Intellectual Property Agreements, including their confidentiality and non-solicitation obligations; and

(c)    Temporary and preliminary injunction:

      (i)     Enjoining Todor, and anyone acting in concert with him, from using, copying, analyzing, or disseminating Accenture's proprietary, confidential, and/or trade secret information in any fashion;

      (ii)    Requiring Todor immediately to return to Accenture all information, data, files, and other property owned by or licensed to Accenture in his possession, custody, or control; and

      (iii)   Enjoining Todor, and those acting in concert with him, from breaching his contractual obligations to Accenture as contained in his Conditions of Employment Agreement and Intellectual Property Agreement, including his confidentiality and non-solicitation obligations.

(d)    An order requiring Boudria, McIntyre, and Murray to forfeit all of the compensation they received from Accenture during the period of time they breached their respective fiduciary duties to Accenture;

(e)    Restitution and disgorgement of all ill-gotten gains unjustly obtained and retained by Boudria, McIntyre, and Murray through the acts complained of herein;

(f)    Award Accenture compensatory, incidental, consequential, exemplary, and punitive damages in an amount to be determined at trial;

(g)    Award Accenture its costs and expenses, including attorneys' fees (including, without limitation, attorneys' fees pursuant to 18 U.S.C. § 1836 and TEX. CIV. PRAC. & REM. CODE §§ 38.001, 134A.005); and

(h)    Grant Accenture such other and further relief as the Court deems just and proper.

Dated:  October 24, 2017                    Respectfully submitted,


                                           ACCENTURE LLP


                                           By: */s/ Erin C. Villaseñor*_____


Steve Fleckman
Texas State Bar No. 07118300
FLECKMAN & MCGLYNN, PLLC
515 Congress Avenue, Suite 1800
Austin, TX 78701
Tel.: (512) 476-7900
Fax: (512) 476-7644
fleckman@fleckman.com

Sheryl A. Falk
Texas State Bar No. 06795350
Erin C. Villaseñor
Texas State Bar No. 24072407
WINSTON & STRAWN LLP
1111 Louisiana, 25th Floor
Houston, TX 77002
Tel.: (713) 651-2600
Fax: (713) 651-2700
sfalk@wintson.com
evillasenor@winston.com

Michael P. Roche (*Pro Hac Vice* forthcoming)
Illinois State Bar No. 6216758
Daniel J. Fazio (*Pro Hac Vice* forthcoming)
Illinois State Bar No. 6296352
Benjamin M. Ostrander (*Pro Hac Vice* forthcoming)
Illinois State Bar No. 6309843
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL  60601
Tel.: (312) 558-5600
Fax: (312) 558-5700
mroche@winston.com
dfazio@winston.com
bostrander@winston.com

**ATTORNEYS FOR PLAINTIFF**
**ACCENTURE LLP**