UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ACCENTURE, LLP                    ) Docket No. A 17-CA-1013 SS
                                  )
vs.                               ) Austin, Texas
                                  )
MARC A. BOUDRIA, ROSS A.          )
MCINTYRE, MATTHEW L. MURRAY,      )
AND JOHN J. TODOR                 ) October 25, 2017


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE SAM SPARKS


APPEARANCES:

For the Plaintiff:          Mr. Michael P. Roche
                            Winston & Strawn
                            35 West Wacker Drive
                            Chicago, Illinois 60601

                            Ms. Sheryl A. Falk
                            Winston & Strawn
                            1111 Louisiana Street, 25th Floor
                            Houston, Texas 77002

                            Mr. Steven A. Fleckman
                            Fleckman & McGlynn
                            515 Congress Avenue, Suite 1800
                            Austin, Texas 78701


For the Defendant:          Mr. Michael J. Golden
                            Boulette, Golden & Marin
                            2801 Via Fortuna, Suite 530
                            Austin, Texas 78746


Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                            501 West 5th Street, Suite 4153
                            Austin, Texas 78701
                            (512)391-8792


Proceedings reported by computerized stenography, transcript produced by computer.

THE COURT:  This is 17-CV-1013, <u>Accenture, LLP vs. Boudria, et al.</u>

I'll take announcements, please.

MR. FLECKMAN:  Your Honor, Steve Fleckman.  May I approach the podium?

THE COURT:  Yeah.

MR. FLECKMAN:  Steve Fleckman appearing for the Plaintiff Accenture, LLP, your Honor.  I'd like to introduce Mike Roche, who is with the Winston & Strawn law firm in Chicago, now admitted pro hac vice, and, also, Sheryl Falk, who is from the Houston office of the same firm, also admitted in pro hac vice, I believe.  And we are joined by Bonnie Hobbs, who is vice-president for U.S. litigation for our client, Accenture.

With that, your Honor, I'm going to turn the podium over to Mr. Roche, who will make the presentation.

THE COURT:  No.  We're going to let the lonesome fellow over here.

MR. FLECKMAN:  Absolutely.

MR. GOLDEN:  Good afternoon, your Honor.

On behalf of the defendants, Michael Golden from Boulette, Golden & Marin.

THE COURT:  All right.  Mr. Fleckman, you can make your introduction now.  I have a motion for temporary restraining order, to expedite discovery, and protective order in a rather large pleading.

MR. FLECKMAN:  Yes, your Honor.

And I'd like to introduce Mike Roche, who will be the primary presenter on the merits of that application.

THE COURT:  Mr. Roche.

MR. ROCHE:  Thank you, your Honor.

I know it's a large pleading, your Honor, so I apologize for all the paperwork.

THE COURT:  Well, they're all large in this court, for some reason.

MR. ROCHE:  If I had more time, I'd have written a shorter pleading.  We had a -- it was an emergency and we also had quite a few facts we had to cover, your Honor.

The basic situation here is that a couple of years ago, Accenture bought a company called Chaotic Moon, paid a lot of money for it, tens of millions of dollars.  As part of that, they bought the intellectual property, and a number of the employees came over to Accenture with that.

Seven months ago, up to about a year ago, three employees left Accenture, didn't pursue them.  That was fine. They were going to go do something else as far as --

THE COURT:  Now, let me stop you here in your presentation.  There's references to employment contracts.  One, if it's in there, I didn't get to it on the noncompete.  Two is, of course, the same thing on taking information and doing the bad things that you're alleging and then, intellectual property

contract -- two contracts.  Summarize those for me first.

MR. ROCHE:  Certainly, your Honor.

All four of the individuals signed employment agreements.  And to be clear, I know noncompete has been mentioned and usually those kind of cases involve noncompetes, and while those exist in the contracts, at this time, we are not pursuing the noncompetes --

THE COURT:  I understand that.  But they knew it because they signed it.

MR. ROCHE:  That's correct.

THE COURT:  It's still a factor for me because you're asking for a really broad injunction.

MR. ROCHE:  We are, your Honor.  And I guess if -- and I'm happy to go through all the facts in those agreements.  We had --

THE COURT:  No.  I don't need that.  I just want to make sure that there was a no compete.

MR. ROCHE:  Yes.

THE COURT:  And that there was pretty well standard the fiduciary relationship and there would not be taking any trade secrets or whatnot.

MR. ROCHE:  That's correct, your Honor.

The agreement covered all those things, the noncompete, the non-solicit as to both customers and employees, and confidential information protection were in those agreements.

THE COURT: All right. Are they somewhere in all of these papers?

MR. ROCHE: They are somewhere in all of those papers, your Honor. I could point them out specifically, or we could send something over to the Court later pointing out specifically where those are.

So there's both contractual obligations here as well as common-law obligations related to the trade secrets and the duty of loyalty. A few of the employee left quite a while ago. We didn't pursue them, we let them go do something else, which is what we expected. After a group of four, the four defendants left last month, we learned after the fact that they may have been taking some information. And so, we had some IT people, forensic experts go in to check their computers, and we found a couple of groups of things. One, communications among themselves talking about how they were going to take our information and give them to a competitor basically.

THE COURT: Now, I've reviewed all of that and I take it, that's why you go back to January 1.

MR. ROCHE: That's correct, your Honor.

And then, we also -- sounds as your Honor's reviewed the papers, but they took an enormous amount of our data, as well, including software source code, which is sort of the formula for Coke when it comes to software. This is how software gets built and --

THE COURT:  Your motion for injunction is superior to most because you identify the codes by numbers.  Too many times, in all of these cases -- and you have them all the time now with trade secrets, federal and state now, and I'll say, tell me what your trade secret is because if I don't understand it, I don't think that jury's going to understand it.  And they -- you know, they just say, well, it's our practices or, you know, something like that.

And it's important because if this injunction is granted and a temporary injunction and a real injunction is granted, it does two things.  If it's appropriate, it stops things.  Sometimes a little harder to stop, but stops things.  It also cuts off damages.  And when you get around to a trial -- and I couldn't give you a trial right now until March of 2020.  I am booked solid until then, and that doesn't take into consideration any of the criminal dockets that I have.  And right now, I have probably 30 criminal cases needed to be tried or dismissed until January 1.

So when you get down the road, the damages are usually slight with an injunction like this.  So my hat's off to you a little bit on the identification.  You've still got some air in there that I don't know what it is, but at least the injunction talks about specific programs that are identified by your expert witness in here.

MR. ROCHE:  That's correct, your Honor.  We have been

able to identify very specific and important pieces of information.  I should jump ahead a little bit.

Our opponents and we have been discussing a possible agreed order or agreement on this, and we were talking last night and this morning and we got very close.  I think we've agreed on sort of several items that we think would be a good order, and there's really one item left --

THE COURT:  Mr. Golden's a good lawyer and he knows that if you get an agreement, you live by it.  It cuts -- if they're going to be liable, it cuts their damages considerably.

MR. ROCHE:  Yeah.  And we hope there are no damages.  We want to stop the stuff before we get hurt.  So that's -- you know, that's exactly what we'd like to see happen.

So, Judge, you know, after we saw this and we filed our papers, we've had discussions with the other side, and there's several items we asked for.  We've worked out an agreement, I think, with all of them with one exception.  And Mr. Golden could speak to this, too.  We haven't been able to work out the customer restriction and --

THE COURT:  Well, that's the two points in your proposed injunction that I traded.  I don't know how you would know who prospective clients are.

MR. ROCHE:  Well, that's part of what we've been discussing, your Honor.  And so, what we've -- we agreed to limit that.  We said that's a reasonable point and so, let's come up

with a way to limit that.  And so, what we said is, and we'll even limit it to even Accenture actual clients.  Maybe you don't know something --

THE COURT:  That's what I was going to suggest.  So that's knocked down.

MR. ROCHE:  So what we suggested --

THE COURT:  The cavalry's coming.

MR. ROCHE:  What we suggested was, we'll limit it to clients that you folks worked on yourselves, the four people, the ones you actually worked on, and then, clients for whom you submitted a bid.  You know, so ones you actually worked on, you should know that.  And then, once you worked on and submitted a bid.  Maybe you didn't get hired, but you got a lot of information because you submitted a bid.  Or somebody else worked on it but you submitted a bid.

THE COURT:  And that runs -- Mr. Golden, does that go to January 1, too?

MR. ROCHE:  Well, they've all been at Accenture only since 2015.  So there's one piece we would say customers you've worked with since you've been at Accenture, 2015.

THE COURT:  All right.

MR. ROCHE:  And what we heard back -- we met -- like I said, the parties made a lot of progress on working this out.  But we heard on that one is, well, they might not know -- I think clients they worked with you were fine with, but the clients they

submitted a bid on, they might not know.  So we compromised again and so, we could we make it clients they knowingly submitted a bid on.  So the point was made, well, what if they wrote up a chart somebody used and they didn't know.  Okay.

THE COURT:  Well, I would have required that, anyway.

MR. ROCHE:  Yeah, I assumed you probably would.

Then we heard back they still might not be able to keep track, which I said, well, I submit bids to clients, I could tell you which ones I bid.  But they wouldn't agree to that and they said, well, they might have information on some that they don't know what their -- we, frankly, didn't really understand the objection, your Honor.  But I think we essentially have a deal with the other side as long as we can come to this agreement that they can't solicit clients that they worked on or that they knowingly submitted a bid on.  So it ties very directly to them.

And the other prong was clients that they have our confidential on.  As we said, we think they took a lot of our information.  So let's just use an example if you didn't work on Exxon but you took, you know, book of Exxon information and data, you can't solicit Exxon for a while.  This is just, you know, for a few weeks.  You can't solicit Exxon for a few weeks.  And what we heard on that was, well, they might not know everybody they took information on, which we said, are you admitting you took so much information, you can't even tell what companies you have information about?  And we didn't really get a sufficient answer

to that.  But that struck us as a very -- we thought at least a reasonable, pretty limited customer restriction.  And that's the only piece that we still have open.  I think we could get to an agreed order at that point.

THE COURT:  All right.

MR. GOLDEN:  Your Honor, Mr. Roche is correct on where we are -- where we're lacking on agreement.  And I want to say for folks who I have not worked with before, they've been very cordial and have tried very hard.  It's just short-term and we didn't get there.

Basically what my guys are asking, your Honor, is they really want to know what they're not supposed to do; and, in particular, they want to be able to report back to their employer, hey, this court order has been entered, this is what I can and I cannot do.  And I understand that the concept of any client with whom you have worked.

THE COURT:  No.  My understanding reading these pleadings -- and I'll have to say that I handed it up pretty quickly -- is some of them were active in establishing this company, their new employer.  So that doesn't look too good. They need to clean that up a little bit.  I don't think they're going to fire themselves.

MR. GOLDEN:  I think there's a miscommunication, your Honor.  So three employees of Accenture left after this CEO -- Chaotic Moon was an Austin startup, they were bought by

Accenture.  Accenture fired the CEO of Chaotic Moon.  CFO of Chaotic Moon said, well, I've gotta do something --

THE COURT:  And took your clients.

MR. GOLDEN:  No, not yet.  That's right.  Eventually. He and two other former Accenture employees, the folks that Mr. Roche says they're not going after when he said at the beginning of his presentation, we're not going after folks.  These three founders founded this company called HyperGiant.

THE COURT:  Okay.

MR. GOLDEN:  And then, hired the four defendants.  And so, the four defendants worked for their former bosses, who are now their current bosses, too.

And so, the way that I understand the temporary restraining order standard itself is the order has to say what it is you can and cannot do.  And our sole concern is -- and this is why we've been able to work out effectively everything else.  Our sole concern is, when it says anybody for whom you worked in the 18 months before you left, or anybody for whom you submitted a proposal or assisted in the preparation or submission of a proposal during the 18 months before you left, your Honor, if I didn't go look in my billing records, I couldn't name every client I've had in the last 18 months.  Maybe that makes me a bad lawyer, but I don't think so.  There's no way I could do it.  I do a lot of 15, 20-minute matters on a regular basis, and if I don't look at my billing records -- these guys have been

separated.  They don't have access --

THE COURT:  You're not trying to sell them anything.

MR. GOLDEN:  That's --

THE COURT:  Just trying to see how expensive you are.

MR. GOLDEN:  That's a fair point, Judge.  But in any event, that's the whole dispute we have.

THE COURT:  I think y'all can work that out because I don't -- you know, there's no point in playing around.  They left -- you know, this whole industry started off as stockbrokers, years ago, and -- actually, it started off, oddly enough, with beauty shops.  You know, that's where the contracts who can't work within 40 blocks of this because they weren't hiring the beautician, they were hiring the beautician's clients.  And that's been true ever since then and I get them all the time.

But y'all are smart cutting off the door right now so that you don't go two years and then, have to expend all of the money and effort to get a judgment that may or may not be favorable to either party and may not ever be collected, anyway.  So work it out.

I don't -- I think that's too long.  Anybody that you -- I think anybody that you made a proposal to in that period of time would be applicable.  But just anybody that you saw, that would be taken back in on anybody that you're now serving.  Follow me?

MR. GOLDEN:  I think so.

THE COURT:  So that's a list of people that should -- or firms that should be pretty ascertainable.  Because as it is now, it will give them a lot more guidance than this will, although I found this to be good, except for potential clients. I wasn't going to sign anything on potential clients.  Who knows.

So any other points y'all are having trouble with?

MR. GOLDEN:  I think we've got one point on the expedited discovery order and I think we've worked out the -- they want to make some changes to the Western District proposed protective order, which I think we can work out.  I think we have one comment on the expedited discovery order, which is -- they've included some language in the expedited discovery order which is, they want to take some depositions quickly, we understand.

THE COURT:  Yeah.

MR. GOLDEN:  And they've added some language that is without prejudice to taking further depositions further on down the road.  And I just want -- I'm trying to clarify, I don't think they get the right to take the depositions of my clients twice.

THE COURT:  Well, I've never stopped them from taking parties on the second or third depositions.  So you're not giving up anything on that.

MR. GOLDEN:  Very well.

THE COURT:  And I was a little concerned, but since they've got a lawyer I know can represent them on the 14 days, I

mean, I was thinking about a little bit more than 14 days to take all those depositions. Have y'all worked that out?

MR. GOLDEN: We have talked about that, your Honor, and we thought that probably 14 days is not enough. Obviously when they filed the application, they didn't know there was counsel on the other side. But if I look at the calendar, three weeks from now is the week before the week of Thanksgiving. So a 28-day temporary restraining order is a problem because it drops us right on the Wednesday before Thanksgiving.

We haven't talked to the Court yet about the Court's schedule for a preliminary injunction availability the week of November 13th, but the parties are agreeable to making the schedule a little bit longer than 14 days to accommodate --

THE COURT: Make them as long as you can. Right now, I couldn't give you possibly a hearing till February. I'm not -- don't have any time. I mean, I carry this calendar around. This morning, I had a wiretap case with RICO allegations and murder, and it was set and, of course, lawyers are never ready, so I've had to reset it to February, which was the first available time, although I've got cases set through there, with the exception of Thanksgiving week, the Monday, Tuesday, Wednesday of Thanksgiving week, I'm set for every day in trial. Every day.

For you new members of the Western District of Texas through wonderful fraternity of pro hac, Austin has the heaviest-weighted docket in the United States and we have two

district judges. And my young partner is approaching 74. And we're supposed to have five district judges when I came here in 1991, but we have not done anything like that.

So get along -- let's handle this first. Get the initial one on. If you have any problems, call, and if you can't handle it over the telephone, I can bring you back and we'll be in this room daily. But it would be better, and better for the defendants, too, to get a little tightening on that. The only thing I was going to change, so that you know, is I couldn't -- I didn't want to litigate what a prospective client was.

MR. GOLDEN: And, your Honor, just so I understand, I understand your schedule. I haven't talked to my clients about this, you know, we'd, of course, agree to a referral to a magistrate. I haven't talked to them about this, either. But the issue is when I spoke to my clients and said, hey, we should agree these restrictions for 21 or 28 days, it's a lot different to agree to them for five or six months. I mean, the plaintiffs could just go away and drop the lawsuit and leave it alone and we'd be stuck with the order --

THE COURT: No. All you have to do is tell me. Somehow, I'll work it in. And you're right, I might could have one of my magistrates handle it. They're handling a lot of stuff. So that you know, by the way, Austin has always had magistrate judges that handle civil litigation because Austin basically in the old days was civil, everything civil. And as

Austin has exploded in the last several years, we've really picked up on federal crimes. So we have a lot of it.

I'm not suggesting in any way, shape or form that whatever I sign is going to last months and months, but I think it's something that y'all can get together and surely they can see things in their client's business that can kind of give them one way or the other. But if we need a hearing, we'll get one somehow. I'm just -- I don't know who I'm going to bump or how we're going to bump.

I'm too old to go all day, all night, but it's just a full docket. The only time that you got here -- and I'll have to say, I read everything that come in, but nine times out of ten, I deny temporary injunctions for a couple of reasons. The pleadings are too general. They don't describe exactly what they want. Looks to me pretty obvious that the defendant's not going to have any money at the end of the road. And so, why do that when we're going to have a trial on the merits. On the legitimate ones that these allegations are, I like to tie up everybody for a period of time because it protects the defendants in their individual capacities, and it gets the plaintiff back in a situation where they don't have to worry about anything other than losing talent.

Okay. Today is Wednesday. Let me know by Friday if we need to enter something on our own or if y'all can come up with something.

MR. GOLDEN: Yes, your Honor.

THE COURT: Yes, sir.

MR. ROCHE: Just because of the sensitivity of what we know was taken, my client's real concern even very good -- even 48 hours, they're concerned about not having anything in place. Could we at least have an order entered today restraining use of the information while we work out the entire overall order?

THE COURT: No. Their lawyer's going to tell them not to nor -- the worse thing they could do is use the information. Y'all will find that out. And the second worse thing they can do is destroy anything. You're going to find that out. And if they do that, it's just like cutting their throats because from then on, they're dead. And they're bound to be smarter than that, you would have hired him.

MR. ROCHE: What we found out since then, though, Judge, makes us --

THE COURT: Ah, you know, greed is a terrible thing, sir. It runs the world, unfortunately. Friday, let me know.

MR. GOLDEN: Yes, sir.

THE COURT: And I'll be sentencing everybody Friday, so if you want to come back over here and participate, you're welcome.

(End of proceedings.)

* * * * * *

UNITED STATES DISTRICT COURT)

WESTERN DISTRICT OF TEXAS    )

   I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

   I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

   WITNESS MY OFFICIAL HAND this the 2nd day of November, 2017.


                              /s/*Lily I. Reznik*
                              LILY I. REZNIK, CRR, RMR
                              Official Court Reporter
                              United States District Court
                              Austin Division
                              501 W. 5th Street, Suite 4153
                              Austin, Texas 78701
                              (512)391-8792
                              Certification No. 4481
                              Expires:  12-31-18